And the Court will hear argument next in the Trout Unlimited and Alsea Valley Alliance cases. Mr. Schiff. Thank you, Your Honor. Damien Schiff for the appellants, Alsea Valley Alliance, Building Industry Association of Washington, and others. With Your Honor's permission, I'd like to reserve two minutes of my time for a little- Let's watch the clock. The hatchery listing policy is illegal and contrary to the Endangered Species Act, precisely because it requires the National Marine Fisheries Service to focus only upon the naturally spawning segment of these ESUs and to look at- Counsel, I've got sort of a threshold question with respect to standard of review. In Northwest Ecosystems, we held that the 1996 DPS policy was entitled a Chevron deference. What makes the 2005 hatchery listing policy any different? Your Honor- Or do you concede that Chevron deference applies here? Ideally, Your Honor, we'd like to say that the Court may not reach the issue of whether Chevron deference applies to this policy because we believe that the plain meaning of the ESA does not require- or I should say the plain meaning of the ESA is contradicted by the hatchery listing policy and, therefore, the ESA must win out. Where does the ESA say that hatchery fish cannot be considered in any respect as part of the species?  And in fact, we are very much urging that hatchery salmon should be very much considered part of these ESUs and that they should be considered with respect to the role of sustaining the entire ESU. As the hatchery policy now stands, the agency only looks at- It doesn't say that they can't. Where does it say that they must? To the extent that NIMS has- Well, Your Honor, it does very much indirectly by saying that the question is whether to list or not list the listable entity, whether that be a species, a subspecies, or a distinct population segment. And in this case, that DPS is the salmon populations. NIMS has already determined, the agency has already determined that these hatchery salmon are part of the listable entity, and therefore, the analysis has to be focused upon the listable entity because the ESA itself says to the Secretary, you may list only species, subspecies, and DPSs. It does not make any reference to subcomponents of the listable entity. Counsel, the way I read the words of the statute, species or population, in the other words, it looked to me as though it left a lot of discretion for the agency to figure out in the circumstances of a particular critter whether it was a distinct species or a distinct subspecies or a distinct population or whatever. Now, obviously, these hatchery salmon aren't a different species, but whether they're a distinct population or not, I would have thought all we could do is review the agency's determination to see whether it was arbitrary and capricious and defer to their interpretation of the statutory language, population. Yes, Your Honor. But it is true that an error of law is a necessity and arbitrary and capricious You understand what I'm saying is I don't understand your error of law and plain meaning argument. It seems to me that the law itself confers discretion on the agency to determine what a distinct population is. Just to follow up on that, with respect to plain meaning, is it your contention that subsection 16 in the definitional portion of the ESA is the controlling section, which you feel has plain meaning? Yes, Your Honor, in connection, of course, with section 4, which actually tells the Secretary that he must list species that he determines to be endangered or threatened. And then, of course, species... What would help me a lot is, and I'm sure this would be true of Judge Klinko, what specific language in the ESA are you relying on that suggests that the plain meaning controls and obviates any kind of discretion by the agency? It is, as Your Honor suggested, the definitional section, subsection 16. All right. Includes any subspecies of fish or wildlife or plants and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature. All right. What is it in that passage that you say compels the construction that we don't look to the agency for any kind of interpretation? Well, Your Honor, to clarify, we are not arguing that the agency is without expertise to determine whether in any given instance, based upon the dynamics of a certain salmon population, more focus should be placed upon hatchery or naturally spawning salmon. What we're saying, of course, is that the agency has already made this decision. The agency has said these hatchery salmon are so genetically similar to the naturally spawning salmon that we consider them to be part of the same DPS. So the question as to what is the shape of this DPS is simply not presented. The agency has already told us. I mean, what's a DPS? I'm sorry, Your Honor. Distinct population segment or in the context of most of these salmon populations, ESUs, evolutionarily significant units. But the point is, Your Honor, is that the agency has already essentially answered the question I believe that you've been asking, which is should we defer to how they define these DPSs or ESUs? They have in fact defined them to include hatchery salmon, but yet they still discredit the role of hatchery salmon in sustaining the listable entity as a whole. And that really is the key. The ESA makes no reference in subsection 16, Your Honor, or frankly in section 4, to the listing of naturally raised populations or naturally spawning salmon populations. It simply makes reference to whether the entity that is identified for listing is in fact endangered or threatened. And there's nothing in the Act, is there, that would require NEMFs to ignore the distinctions between hatchery and natural fish? By no means, Your Honor. And we do not attempt to force upon the agency some categorical rule that they have to ignore the differences. But at the same time, the agency itself concedes that from their perspective, a categorical rule is also improper, that you cannot say categorically that hatchery salmon have a certain effect with respect to naturally spawning salmon or with respect to the ESUs as a whole. And yet the hatchery listing policy makes that very categorical judgment. It says that we will only look at part of these populations, which we have included within the DPS or the ESU, because we believe that they're basically the same fish, and yet we will only look at them to the extent that they can sustain another portion of the population. The agency is not looking at what the ESA requires, which is the entire population that is identified for listing. It may very well be, Your Honors, a different case if, in fact, the population that were offered for listing were just the naturally spawning component, for example. In that case, it would be a totally different analysis. Well, the ESA does allow for or require consideration of propagation, and it allows or requires consideration of the contribution to conservation. So why is it inconsistent for the agency to have made the decision that it made, that is, to consider the effect of hatchery fish, depending upon their contribution to preservation of the species? Your Honor, we do not believe there's anything wrong at all with, of course, considering how hatchery affects the viability of the species. The problem is, though, that the statutory load star is the population unit that NIMS has identified for listing. And the difficulty here, of course, is that that unit is an ESU, a salmon population, that includes not just naturally spawning salmon, it includes hatchery salmon. And so, therefore, to make the listing decision, it must be made with reference to that entire listable unit, which includes both types of salmon, and which the hatchery listing policy forbids. The hatchery listing policy says expressly, the role of hatchery will be considered only to the extent that it can sustain the naturally spawning portions of the salmon populations. That language should say hatchery salmon should be considered to the extent that they can preserve the entire population. The question, I think we're all asking, then, where does the ESA say that? It's a mandatory direction. That's the problem. If the ESA doesn't say that, then why isn't it going to defer to the NIMS judgment? Your Honor, the ESA, for example, says nothing about why the – I should back up. Excuse me. The ESA says expressly you can list species, subspecies, and DPSs. The ESA does not say you can list species, subspecies, and DPSs, and also independently naturally spawning subsegments of DPSs. And because of that, because the ESA only authorizes the listing of certain entities, it therefore follows of necessity that when the agency determines whether or not to list one of those entities, it has to make that determination with respect to the entire entity. And again, I have to emphasize, Your Honors, that the National Marine Fishery Service has identified the salmon populations to include both types of salmon. And so it has to make the judgment as to whether that salmon population is endangered or threatened with respect to the entire population. Ordinarily with salmon, after a few years they come back to the stream where they were born. And that's where they spawn. And if you look at the places where they spawn, they tend to be very shallow, small areas at the very top of the stream. And different salmon go to different stream heads because different salmon spawn in different places. So I don't see why they're not distinct population segments. Your Honor, are you asking whether the naturally spawning salmon are distinct population segments? It seems to me that there's a Gakona Creek population of salmon. There's a Chena River population of salmon. There's a Copper River population of salmon. No Yukon River salmon go up the Copper River, and no Copper River salmon go up the Yukon River. It just doesn't happen. So they're different populations. Now, they're the same species. You can take sperm from a Copper River salmon and inseminate eggs from a Yukon River salmon, but they're different populations. And I don't see why the agency couldn't go either way on it, decide, well, it's the same species, so it doesn't really matter that you're getting fewer Gakona River salmon. Or it could decide, oh, each population is a distinct population, and we want to make sure you don't run out of Gakona River salmon. It seems like it's just up to them. I agree entirely, Your Honor, that it is the responsibility of the agency to identify what it wishes to list. But, again, I really have to emphasize that the agency has already done that. The agency has already identified whether it's going to list just one river of salmon or it's going to list several rivers. It has identified these ESUs already. And so that question, I do not believe, is fairly presented, Your Honors. What's presented is whether once you have identified, say, a Chena River ESU of salmon, can you then discriminate among members of that population and then make your reference or your determination as to whether to list that population based upon only how part of it is doing. Counsel, you're down to less than two minutes if you want to reserve any time for your side. I would like to, Your Honor. All right. You may do so. We'll hear next from Ms. Goldman. Thank you, Your Honors. And may it please the Court, I represent the Trout Unlimited parties who are appellees in both appeals. Since we are the only parties defending Judge Kuhnhauer's decision in the Trout Unlimited case, I would like to devote my arguments to that case and rely on the government to respond to LC Valley and the building industries since we are joint appellees in that case. And I would like to share five minutes from that. Let's see. Are you talking about the steelhead now? Yes. I don't understand why on the steelhead, too, the agency shouldn't be deferred to. These are just technical decisions that are supposed to be made by people that know a lot about the fish. I don't see why we should interpose ourselves. Well, Your Honor. I could argue with them. You have argued with them. You have scientists who disagree with them. But it's between some advocacy group scientists and the agency. Unless the agency is arbitrary and capricious, I don't see why it matters. Your Honor, we ---- Whether scientists disagree or even whether they're right. Well, we pled, Your Honor, and the district court agreed that in this instance the fisheries service did act arbitrarily. I know. And contrary to the statute. The question is whether we agree. And if I may, I would like to persuade you that you should agree with the district court on that. I don't see why we shouldn't defer in both directions to the agency. Well, there are two reasons why the court should affirm Judge Kunawa's decision that the downlisting of upper Columbia steelhead did violate the statute and the best available science. First, counting first-generation hatchery fish and assessing the viability of the steelhead runs counter to the statute and the best science. And I'll explain that in a moment. No, well, counter to which statute? The Endangered Species Act. Section 16? What are you relying on? I mean, it's a huge act. Yes. What particular provision are you relying on? Okay. We are relying on the purposes of the statute. It's in. Yeah, but that doesn't help. What specific command in the statute is being violated or is being complied with, depending on your point of view? There are many provisions of the statute that evince that purpose and put it into place, and the purpose being recovering species to the point where they are self-sustaining in their natural habitat. It is in the purposes. It's in the definition of conservation in 1532. It's in the recovery plan provisions in 1533F. It's in the listing provisions. So it's in subsection 3 in the definitional section? Yes, where conserve is defined as bringing the species to the point where the provisions of the act are no longer needed. The only place in the statute. You're talking about the general purpose here rather than some specific violation of text, it sounds like. No, there are many violations of the text. If you let me. Read some text that the agency violated. Well, let me explain it. It would take a long time to read it. If I can refer you to all the. Which is the one that you rely on most. There must be some threshold language that you feel controls. The threshold language. Well, first, as I was trying to explain, the definition of conserve is the only place in the statute that mentions artificial propagation. It is a tool to be used to get the species to the point where it is self-sustaining and no longer needs the protections of the act. In section 4, which is 1533, we have the listing provisions. A species is listed when it is at risk of extinction because of degradation of its habitat. One of the purposes is to make sure the ecosystem can support the species. A species may be listed when its habitat does not support it, must be listed. I understand the facts in the record here. You had scientists, the agency had scientists, they disagreed. Your scientists may be right, may be wrong. I don't know. We don't make scientific judgments. Congress gave it to the agency to make scientific judgments. Why isn't that the end of it? Well, Your Honor, if I may explain, Honda, the first point that I would like to address is that counting the first generation hatchery fish before they spawn and reproduce progeny is not consistent with the Endangered Species Act provisions I was citing, which are cited in our brief, and the purpose of the statute as a whole. Because why? It's the same species. Well, I am raising a much different point than whether it's the same species or not. The fishery service has always counted hatchery fish once they spawn and produce progeny. It counts all of those fish because they are sustaining themselves in the natural environment. The hatcheries, though, are producing fish into the environment that may not be sustainable. And on the record for Upper Columbia Steelhead, the fishery service found that one of the two hatchery populations is not successfully reproducing and cannot sustain itself in the Upper Columbia River environment. Those fish, then, are not self-sustaining, and the fishery service does not believe they ever will be. And yet it counted them in the viability assessments, and it viewed their abundance to be beneficial. At the same exact time, it found that their abundance is a threat. It found that the large numbers of returning hatchery fish compete with the wild salmon at the spawning grounds. Spawning habitat is very limited, and the hatchery fish come back and they dominate. Sometimes they're as high as 90 percent of the fish on the spawning grounds. And the fishery service said that is a threat because the hatchery fish are not as fit. They've accelerated the run timing. They have not adapted to these conditions. They do not survive in these conditions as well as the wild salmon. And the limiting factor for these salmon was not their abundance, which is low, but their productivity. For every three to four adult salmon on the spawning grounds, only one comes back. And what the fishery service found in looking at the hatchery fish is they have boosted the abundance. Abundance is up somewhat. Still, abundance is far below the recovery targets. It's only at 14 and 30 percent of the respective recovery targets. But the limiting factor was productivity. The fishery service listed these steelhead as endangered because of their extremely low productivity. That is the fishery service's language. And it found in this current listing round of decisions that the hatchery fish have not improved the productivity of the wild. In fact, it found they are making it worse. So much so that the fishery service has authorized a fishery to catch the surplus hatchery fish to prevent them from getting to the spawning grounds. Still. But that seems to fit perfectly into the goals of the act. If the goal, on the one hand, if you're arguing that we should be trying to protect the natural fish and the hatchery fish are predatory, wouldn't it make sense then to separate the classification and recognize that natural would be endangered, but hatchery would permit some taking? That might be a fine way to address this problem. But that's what, in effect, NIMS did, did it not? It did. Once it listed the hatchery fish, it then allowed take of them. That is not the basis of our appeal. Our appeal challenges, not our appeal, our challenge, and Judge Kuno, if I'm, that the downlisting of the upper Columbia steelhead cannot be based on the numbers of hatchery fish when those hatchery fish are a threat to wild steelhead viability. And that is the basis of our complaint. The hatchery fish are the same species. And what you're arguing, basically, is that they have a lower survival rate. I don't see why the agency can't just take that into account, take into account the survival rates of the non-hatchery steelheads, and have a policy such as it does to encourage the non-hatchery steelheads. Well, Your Honor, on this point, we are accepting the findings of the agency scientists that the hatchery fish in the upper Columbia basin are But you're not accepting the agency's judgment on what to do about the findings. No, because under the motor vehicle standard, what the agency did here was at odds with the evidence before it. It counted these hatcheries as beneficial when, based solely on increased numbers and the fact that they may be spreading out a bit because of their increased numbers. But didn't they consider both positive and negative effects? That is an argument that's been made by counsel. That is not true in the record. They counted abundance as a positive factor and downlisted on that basis. The record has evidence, though, that these steelhead threatened the productivity, which is really abysmal. One fish back for four on the spawning grounds is abysmal and not sustainable. But it counted the hatchery fish. Well, that abysmal. I mean, animals in the wild mostly die. Well, again, I defer to the government. The government said this was extremely low. It was a cause for concern and it was a reason to list this subpopulation as endangered in the first place. I have a slightly different, very practical question. I've read this stuff. I see, you know, people say, well, gee whiz, there's a long-term risk here. And on the other hand, people say, well, there's some benefit, particularly short-term. And I read it and I sort of see stuff in effect on both sides. Perhaps you're right that the balance is in favor of saying there's more risk here than the NIMPS recognized. But how are we practically supposed to thread through that and make a judgment about whose science is best? As long as the government has acknowledged the points that are made and considered them and responded to them and made a decision. What are we supposed to do? Just purely practically. Your Honor, I would like to respond briefly so I can save some time for rebuttal. In this case, we're not asking the court to wade through all the science. We want to focus on the decision to downlist the steelhead, which was based on the numbers of hatchery fish that came back before they could spawn. Are they part of the science? Except the science in the record, when the government, I think, will agree that they cannot protect the hatchery fish in their own right. They have to consider them only as they contribute to the wild steelhead. And the district court found the hatchery fish do not contribute to the wild steelhead until they have spawned and reproduced progeny. A hatchery can introduce as many fish as it wants. And here we're talking about 900,000 fish a year. That is not beneficial if they compete with the wild. It is not beneficial if they cannot spawn and survive. I think what you just said is downlisting the steelheads was wrong because three out of four hatchery fish don't reproduce. Is that right? No, it's only one fish comes back for all of the steelhead on the spawning grounds. And the hatchery fish are making... One out of 200,000 or one out of four? The way that they calculate, for every three to four fish on the spawning grounds, one comes back from the ocean. That's what I just said. You said no. I said because three out of four hatchery fish don't reproduce. It's not just hatchery. It's the entire population, and the hatchery fish are making it worse. Yes, and the hatchery fish are making it worse. I'd like to save a few minutes for... Before you save it, salmon, when they spawn, don't eat each other, and they also don't eat each other's food. They don't eat at all when they're spawning. They're just half rotted out, and the females drop eggs in the crevasses in the rocks, and the males ejaculate semen over the eggs. Other than adding to the numbers and perhaps making some streams more crowded, I don't quite understand what your scientific argument is. Well, you know, the government can answer it too because it's their findings, that the hatchery fish are outcompeting the few natural salmon that are there on the spawning grounds and squeezing them out, and yet the future of this population depends on the natural salmon that are adapted to this environment rather than the hatchery salmon that have changed the timing of spawning and migration and the government has found are poorly adapted. And one of the hatcheries, the government has found, cannot sustain itself up in this environment, and the other one, it has not made any positive findings. Given those facts that the government scientists, all of its review bodies have found, it is our view that the government acted contrary to the record and to the science and to the act by downlisting based on the hatchery fish, and that is what the downlisting decision says it did. It credited the numbers of hatchery fish, and on that basis changed the decision from endangered to threatened. Thank you, counsel. We'll preserve your time. We'll now hear from the other side, so to speak. We have Ms. Durkee and Mr. Shilton. How do you plan to allocate your 30 minutes? What we propose to do is that I will address the issues raised by the government. First of all, counsel, I'm sorry. Would you mind introducing yourself for the record? Sorry. I'm Ellen Durkee from the Department of Justice, and my intention is to address the issues raised by the government's appeal in the trout unlimited case, and my colleague, Mr. Shilton, will address our positions aptly in both cases. All right. Very good. You may proceed. This Court should uphold the services hatchery listing policy as a valid interpretation of the Endangered Species Act, and therefore uphold the listing decisions for the Upper Columbia River steelhead and the 16 salmon species applying that policy. And just to clarify, when I use the word species today, I mean as it's defined by the Endangered Species Act to include distinct population segments, but I don't want to say that mouthful each time. The most West Coast salmonid species include hatchery and naturally spawning fish. And in relevant part, what the hatchery listing policy recognizes is that there are no universal conclusions can be drawn about the benefits or the detriments of the hatchery component of these species. And the crux of both extremes in objecting to this policy is that they want to make categorical determinations, when in fact the science is more complex than that. Hatchery programs can have benefits, especially in the short term, to a species, and they can have detriments, particularly in the long term. And often it's not necessarily all or none or all of those. It can be both, depending on the particular criteria. Both extremes object that the policy permits the service to consider beneficial considerations from the hatchery fish in the short term to the ultimate goal of creating natural self-sustaining populations of the species. But only, and this goes to the industry objection, where the case-specific evidence about the hatchery programs warrants such consideration. Now, in the Trout Unlimited case, the district court held and Trout Unlimited has argued that the Endangered Species Act forbids the surface from considering the hatchery fish component of a species when assessing the species' status. They assert that the act requires the service to base its listing determination solely on an assessment of the viability of the naturally spawning component. There is, however, no language in the statute that plainly compels that conclusion. In fact, to the contrary, the Endangered Species Act, Section 4B, directs the service to review the status of, quote, the species, which, as I mentioned, in the case of most of these species, includes both a hatchery component and a naturally spawning component. Beyond that, Congress did not directly speak to how it must assess the hatchery fish in the status review of the species. Because the service's interpretation of the statute is consistent with statutory language and addresses a specific circumstance that Congress did not directly speak to, its interpretation expressed in the policy should be accorded Chevron deference. The district court in the Trout Unlimited case fatally erred at the outset by holding that it would accord no Chevron deference to the hatchery listing policy. The court stated it would accord no Chevron deference because the policy does not purport to interpret the statutory distinct population segment. This doesn't address the issue. The court either misunderstood our argument or misunderstood the significance of the hatchery listing policy, because it's not the definition of distinct population segment that goes to the issues in the Trout Unlimited difficulties with the hatchery listing policy that the court found. The relevant statutory language is found in ESA section 4B, directing the secretary to review the status of the species. It's in the definitions of endangered and threatened species that makes a temporal distinction in the risk and in the section 4A listing factors. Trout Unlimited in their brief doesn't even – does not rely on the district court's rationale for refusing to accord deference. They instead argue that no Chevron deference should be accorded because this is an applied challenge and they cite National Association of Home Builders. However, that case is an opposite. In that case, the plaintiff expressly did not challenge the Fish and Wildlife Service policy applicable there. Instead, it argued that the Fish and Wildlife Service failed to adhere to its own policy in that particular listing decision. Here, the Trout Unlimited argues that the listing decision for the Upper Columbia steelhead is alleged – is invalid precisely because it follows the hatchery listing policy. And this is an important difference. This is a case – in their comments today, they've aimed at simply the downlisting of the steelhead. But if you read their brief and if you read the district court's decision, it all turns on the validity of the hatchery listing policy in that they are arguing that the statute forbids the service from considering beneficial impacts. And that is a statutory, not a factual or a best science kind of argument or an applied argument. At any rate, even if you view this as simply a science issue, the impacts of the modern conservation hatcheries on the sustainability of species is at the frontiers of science. I think the court should understand from looking at the record that in the past, with the production hatcheries, there were indeed adverse effects. But there have been – there's a great deal of science and knowledge that has been developing. And what we're talking about, particularly in the Columbia River steelhead listing, is about conservation hatcheries. And those are the ones that the service has recognized can provide beneficial impacts to species in certain circumstances. And I'd like to just speak briefly then about the particular listing decision for Upper Columbia River steelhead. Let me just ask you a quick question before you do that. Do we review the actual downlisting decision under Chevron, or do we review it for – whether it's arbitrary and capricious? You're going to – you should be reviewing it for both. Because the district court found, and I – and if you look at the brief, they have argued that the listing is based on a hatchery listing policy that supposedly has an invalid interpretation of the Act. Okay. So that aspect of it would be the Chevron deference argument. There is, in addition, a record challenge to whether the record supports the downlisting with respect to the specific hatchery. On that particular point, would you please be responsive to the arguments made by Ms. Goldman? Yes. The argument made by Ms. Goldman is that NEMS only counted the hatchery fish and said that that was – that alone was the reason for listing as threatened instead of endangered. In fact, what NEMS does is that it has four viability criteria, and this is across the board in the way it assesses salmon species. It looks at abundance, it looks at spatial distribution, it looks at productivity, and it looks at genetic diversity. For this particular – the steelhead species, this listing, what they found is that the hatchery programs, these conservation hatchery programs, had increased the total number of returns, and it's the intention – and there's some evidence that it has increased the total number of naturally spawning salmon. But that was not the only beneficial aspect. In fact, what the listing decision specifically says in our supplemental excerpt to record at 105 is that one of the beneficial aspects of these hatcheries was the spatial distribution, that because of the increased abundance from the hatchery fish, the species had actually expanded the territory in which they had naturally spawning species. And this is a good thing. This is what you want to happen is for habitat that's not being used to be repopulated or recolonized by the species. It also said that in general hatchery populations can be a reservoir for the genetic resources, and here there is important genetic resources in the hatchery population. Now, it did say that it was not – it was uncertain that it was – its impact on productivity. It did not say that for sure it was a hatchery population that was causing low productivity. But all of the viability assessments, whether you're focusing only on naturally spawning species or the entire species, they are based on a risk matrix. What the scientists do is they look at these various criteria for individual subpopulations, and then they take that information and meld it together into a risk matrix for the species as a whole, and then they come up with a list and determination based on those different criteria. So the fact that it doesn't demonstrate that there was not a basis for the services finding, that in the short term these hatchery programs mitigated the extinction risk simply because it didn't in every single category provide a benefit. The hatchery listing – I think the other thing to keep in mind about hatchery listing policy as it's been applied, it has only made a difference in two out of 27 listings in terms of – in both of those two cases the species was listed. The difference it made was between a listing as threatened versus endangered. And this is important because the evidence – As opposed to non-listing. As opposed to a denial of listing altogether. The difference between a threatened species and an endangered species is on the eminence of the risk. Hatchery conservation programs can lessen the risk in the short term, and that's what the hatchery listing policy describes. In fact, all the science that they talk about in their brief at pages 13 to 16, all talk about, yes, it can buy time. It can in the short term be a positive contribution to the species. And that's the difference between threatened and endangered. Endangered is endangered. Natural fish from the area and artificial insemination basically, isn't it? Right. In so many species, having the hatchery programs is what has allowed the species to be sustained. As I understand it, tell me if I'm right, I've seen natural salmon spawn many times. The females drop the eggs, they catch in the crevasses. The males ejaculate semen, and there's kind of a gray cloud over the eggs. It's real shallow so you can see everything. And the fish are just dying. They're usually rotted out, often their guts are showing, and then eventually they drift down the stream after hovering over the eggs. And as I understand it, what the hatchery does is it takes the same kind of fish from the same area, and instead of just trusting the dying, rotted out fish to reproduce that way, they cut open the females and get their eggs out and put them where they'll all catch instead of washing away. And they cut open the males and get the semen out and deposit it on the eggs where it won't drift away. And then you get a higher rate of fertilization of the eggs. Have I got this process right? Well, what you're describing is correct. I would add these comments to it that I don't know if they're directly relevant to your understanding or not. But two things. One, steelhead actually can spawn more than once. Steelhead are different than salmon. Well, they're not like the salmon I've seen. Correct. The salmon I've seen, they spawn when they die. Right. And most of the steelhead do as well, but steelhead are capable of spawning multiple times. Secondly, I think it's important to understand the interdependence of the naturally spawning component and the hatchery component with these conservation hatcheries. A conservation hatchery program requires a constant introduction of natural wild fish into the brood stock. That's how you keep it healthy. That's how you keep it from drifting off in genetic adaptation. And at the same time, the hatchery fish, a certain proportion of them, are going to naturally spawn. That's how you get eggs and semen at work. I mean, you couldn't make monkey semen to breed the salmon. Right. Exactly. So they are interbreeding in the sense that a certain proportion of these hatchery fish are going to naturally spawn, and that's how they can boost the number of naturally spawning species. At the same time, the conservation hatcheries, to stay healthy, have to have the wild salmon. So they're not this sort of separate on these separate tracks. They're completely interdependent. And unless the Court has further questions about this aspect of the cases, I'd like to leave time for my colleagues. Thank you very much, Mr. Shilton. Is that right? Yes. Thank you, Your Honor. I am David Shilton from the Department of Justice, and I will be directing my remarks at the Building Association and the Elsie Valley Alliance challenge here in the two cases. And I think, unlike the challenge by Prout Unlimited, the industry appellant's challenge, as I understand it, is not a record-based challenge at all. It's a Chevron 1 challenge based on plain meaning of the statute. As I understand the argument, it is that because the National Marine Fisheries Service, when it determines whether one of these units is endangered or threatened, focuses on, ultimately, the self-sustainability of that population unit over time in the wild. That's the goal. Their concern is that that makes the hatchery fish sort of second-class citizens, if you will. That they are considered, but only in an ancillary way. They can assist, as they do in the case where Prout Unlimited has challenged the steelhead listing as threatened, that they can there make a difference. But in many cases, they haven't made a difference because they simply are not contributing to the long-term sustainability. They make kind of a superficially attractive argument that you've already made the core decision, which is to include hatchery fish as part of the relevant pool. And once having done that, you then can't back off of it and make distinctions among the type of people in the type of individual fish in the pool. So what is your kind of just simple answer to that? Our simple answer is it's two different issues. There's the issue of defining what the unit is. What's the composition of the unit? Who's in, who's out? That's the question that was at issue in ALCE-1. And Judge Hogan in that case said that if NIMPS determines that hatchery fish are genetically a part of the unit, it can't then only list the natural part. It has to list the whole unit. We've accepted that. The question here has to do with, okay, you've defined the unit. Now is that unit endangered or threatened under the Act? And that's a different question. And as to that question, as Judge Hogan recognized in ALCE-2, nothing that he said in ALCE-1 and nothing in the particular segment of the statute that the industry plans to point to says anything about how you consider hatchery fish and natural fish in determining whether the particular unit is threatened or endangered. ALCE-1 was a final listing, was it not? Whereas here we're talking about a status review process in effect? Well, a status review that did lead to listings. So there are 16 salmon unit listings. So there are listings in both cases. But the problem in ALCE-1 was that the service, even though it found that the hatchery fish were genetically belonged to the evolutionarily significant unit, they then went on and said, well, we are only going to list the natural part. And so Judge Hogan said, well, the Act defines species as species, subspecies, and distinct population segments. And since NIMS has decided that the hatchery fish are part of the distinct population segment, it can't leave them out. But there was not a question in that case about how NIMS assessed the risk of extinction. And that's what's involved in this case. In the 16 salmon units here... The bottom line is you're still only listing naturally spawning salmon, right? No, no, we're listing the whole unit, including the hatchery and the naturally spawning. And that's why... So you list them and then you scoop out those artificially spawned salmon that consider surplus. I mean, is that what you do? I'm not saying it right or wrong. I'm just trying to understand what you actually do. Right. For what's called the 4-D rule, which is what applies to species listed as threatened, NIMS can and has said in a number of cases that the hatchery fish, if they are surplus to the goal of keeping the whole unit sustained in the wild, that they may be marked by cutting off their adipose fin and caught. But does your listing include both naturally spawned salmon and hatcheries? They are part of the listing, which is why NIMS has to make this distinction in its 4-D rule. And you make the distinction under 4-D? If it's appropriate in the particular circumstance. Well, that's the difference between listing and taking rights. Isn't that right? Right, right. Yes, the taking protection is a separate issue. Once you've listed a species as threatened, then NIMS can decide to apply protections to part of the unit or to the whole unit, depending on the circumstances. Is the arrangement then that taking is permitted of the hatchery fish and not the non-hatchery fish in some circumstances? In some circumstances, absolutely, where there are a lot of hatchery fish and, in fact, there may be too many hatchery fish. Take home your fish and eat it if it has the clipped out fin. The clipped fin, exactly. So, again, as Ms. Durkee said, it's done very much on a case-by-case basis, depending on what the best available science indicates. Let me ask you something about the distinct population segments. Obviously, they're not different species because they can reproduce together. And as for distinct population segments, I understand that Yukon River salmon and Copper River salmon, for example, are distinct populations. One never goes to the other's river, and salmon can be quite scarce in one of those rivers and plentiful in another. As for whether that should matter, that's a policy question that we don't answer. As for the hatchery fish, though, I don't quite understand whether the hatcheries are located in such places as to make them distinct population segments or whether it's just a hatchery fish because it's clipped and not because it goes to some different stream or river. Well, the hatcheries that are relevant here are generally... When hatchery fish have been defined as part of the evolutionarily significant unit, it is because the hatchery is located in the area and has used as brood stock the natural salmon from that area so that the genes are similar to what's in the stream naturally. Yukon River salmon and the Copper River salmon are genetically similar, too, and they could reproduce if they went to the same reproducing location, but they don't. You could artificially inseminate. Yeah, I suppose so, and I'm unfamiliar with the situation in Alaska, I just don't understand well enough what the distinction is between the hatchery fish and the natural population of fish since hatchery fish, they're not Frankensteins. They're just ordinary fish except bred by artificial insemination. No, they can be very similar indeed, but there are some distinctions, and those are that they have been raised in an artificial environment, and because of that they have some weaknesses that you might not find in the natural population. They don't develop some of the same instincts for avoiding predators and that sort of thing. So in each case, NIST has to look at to what extent the hatchery fish might not be as strong as the natural fish. Are they bred from the natural fish in the location? Certainly for the conservation hatcheries, the ones that would qualify to be in the ESU, yes. That's essential in order to make the hatchery fish to help the self-sustaining population. You're offering the natural population, but they're bred in a more protected environment. They are bred, yes, in a more protected environment. So there are differences and similarities, and I think our point here is simply that NIST has to be allowed to pay attention to those differences in each case, and there is nothing in the statute, as the alliance argues, that says that you have to treat hatchery fish as if they were equal to natural fish in all cases. Certainly the definition of species doesn't say anything about making those distinctions, and if you look at the purpose of the Act, the purpose of the Act is to sustain species and their ecosystems on which they depend, which certainly supports NIST's policy of looking at building self-sustaining populations in the wild, and also the definition of conservation in the Act clearly talks about applying methods of conserving fish so that those methods will no longer be necessary. The whole point is to try and build the stocks back up so that you do not need human intervention anymore, and in light of those purposes, I think it's perfectly appropriate, as the district court found, for NIMS to make these case-by-case distinctions between hatchery and natural fish, unless there are other questions. No further questions. Thank you, counsel. There is some reserved time. Shall we start with Mr. Schiff? Each of you have roughly two minutes, as I recall. Thank you, Your Honor. Again, I'd like to emphasize that the alliance does not argue that the agency should ignore the distinctions between hatchery and naturally spawning salmon. There may very well be behavioral or other genetic differences that would require, on an ad hoc basis, that the analysis for listing be changed. But the difficulty is here, and counsel for the government mentioned this, that the science, of course, does not allow for a categorical judgment to be made about hatchery salmon, and yet that is precisely what the hatchery listing policy has done when it says, in point three, it says we will apply the policy for hatchery salmon only to the extent that hatchery salmon support the viability of a naturally spawning component, instead of the entire We have this distinction between listing, and you've certainly spoken to that, and the taking rules under 4D. Aren't they two separate matters? They are, Your Honor, but our contention is that if the hatchery listing policy were focused on the entire listable entity, we wouldn't even get to the taking issue, because many of these populations would not then be listed at all. The point is that, yes, there may very well be differences between hatchery and naturally spawning salmon, but the ESA requires that those differences be taken into account when making the determination whether to list the entire population, which, of course, has been identified in all these cases to include hatchery and naturally spawning salmon. And therefore, because that is what the ESA requires, MIMS is precluded from only looking at a portion of the population when making that listing determination. If Your Honors have no further questions. Thank you, counsel. Ms. Goldman, you have some time. I'd like to respond to two points. The first is the statutory basis that the government asserts in Section 4B, which requires that it look at the status of the species. That same section requires that the agency use the best available science. And this is all to determine whether a species is listed, meaning it needs the protections of the Act. The flip side is recovery, meaning the species is at the point where it no longer needs the protections of the Act. In the hatchery listing policy, the government added the caveat that hatchery fish will be included in assessments only in terms of their contribution to naturally self-sustaining populations. And it added that to be consistent with the Act and the science. Our argument here is they did not heed that admonition in applying the policy by counting the first generation hatchery fish before they spawn and produce progeny. And that brings me to the second point, which is the statement that's being made that these are conservation hatcheries. I'd like to direct the court to the record on this point, which is in supplemental excerpts of record 174 to 177, and also 105, which is the final listing decision. There the record shows that these hatcheries were traditionally operated to produce lots of fish for harvest. Now they are changing the program to try to meet goals of being a conservation hatchery, to use the natural local salmon in the hatchery. But they're not there yet. They have not actually gotten there. Research is being developed. That's the language that's in the record there. And the only way to tell whether they're really achieving that goal and no longer posing a threat, as the government found that they do at those same pages and in the listing decision at 105, 106 of those supplemental excerpts, is to see whether those hatchery fish are reproducing in the wild and producing self-sustaining populations, which they currently are not doing. And, again, that's the government's findings in the record. Would you like me to provide a site on the Chevron point before I sit down? I realize my time is up. If you wish, you may do so. At supplemental excerpts of record 71 in the hatchery listing policy, the policy says it was not promulgated in accordance with the listing guidance authority of the Endangered Species Act, which is the authority that this court cited in the Northwest Ecosystem Alliance case for giving rise to Chevron deference. Again, that's 71 of the supplemental excerpts. That's ER 71? Yes. Thank you very much, counsel. On behalf of the panel, I would like to express our appreciation to all counsel who argued this morning. This is a very, very complex case, and I think we have been enormously aided by very articulate presentations across the board. Thank you very much, counsel. The cases just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Rymer, Kleinfeld